## COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

SUPERIOR COURT
CIVIL ACTION
NO: 2012-02867

### SHERRY FLORES

vs.

### BOSTON SCIENTIFIC CORP.[1] & others[2]

\*\*\*\*

### RULINGS ON *DAUBERT* MOTIONS

Following hearings on October 3, 2017, these are my rulings on Boston Scientific's *Daubert* motions[3] concerning two expert witnesses for the plaintiff.

### A.    Bruce Rosenzweig, M.D.

Dr. Rosenzweig, a well-credentialed, experienced and published urogynecologist with a practice in Chicago and an Assistant Professor position with Rusk Medical College, is proffered on the subjects of general and specific causation.  He has performed over 1,000 pelvic floor surgical procedures, some with synthetic mesh, and over 300 surgeries dealing with complications related to synthetic mesh, including removal of all three BSC devices at issue in this case.

If permitted, Dr. Rosenzweig would opine that:

1.    The mesh repair devices used in pelvic organ prolapse ("POP") and stress urinary incontinence ("SUI") surgeries, including the Uphold, Pinnacle and Solyx devices, are prone to complications including pelvic pain, scarring in the vagina and pelvic floor, pain into the legs and thighs, dyspareunia (pain during intercourse), chronic

---

[1] d/b/a Mansfield Scientific, Inc., Microvasive, Inc.

[2] John Doe Corporations 1-50

[3] See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993) and its Massachusetts counterpart, Commonwealth v. Lanigan, 419 Mass. 15 (1994).

inflammation of tissue, scar bands or scar plates in the vagina, vaginal shortening or stenosis, erosion of mesh into tissues or organs, and nerve entrapment.

2. "[T]he heavyweight small pore mesh like that contained in the Uphold, Pinnacle and Solyx devices implanted in Ms. Flores has many well-known characteristics that should have caused Boston Scientific to avoid its use in a product intended for permanent implantation into the human vaginal floor. These characteristics include the following: (1) degradation of the mesh; (2) chronic foreign body reaction; (3) fraying and particle loss; (4) Infections and Bio-films; (5) roping and curling of the mesh; (6) loss of pore size with tension; (7) fibrotic bridging teading to scar plate formation and mesh encapsulation; and (8) shrinkage/contraction of the encapsulated mesh.

3. "Boston Science's Uphold, Pinnacle and Solyx devices are not suitable for their intended application as permanent prosthetic implants for stress urinary incontinence and pelvic organ prolapse, respectively, in women, and Boston Scientific failed to act as a reasonable and prudent medical device manufacturer by manufacturing an selling its polypropylene mesh in permanent prosthetic implants like the Uphold, Pinnacle and Solyx."

4. "As a result of these and other inadequacies with the mesh, it is my opinion to a reasonable degree of medical certainty that the implantation of the Uphold, Pinnacle and Solyx devices caused Ms. Flores to suffer numerous injuries which are permanent in nature. These injuries include ... chronic pelvic pain, chronic urinary frequency, significant urgency, stress incontinence, bladder outlet instruction, sensation of incomplete bladder emptying, slow urine flow, multiple erosions, dyspareunia, and multiple surgical revisions."

5. "The medical treatment required to treat Ms. Flores's injuries that the Uphold, Pinnacle and Solyx devices caused were a foreseeable result of her complications."

6. "To a reasonable degree of medical certainty, the Uphold, Pinnacle and Solyx implants and their effect, including shrinkage/contraction on surrounding tissue is the cause for Ms. Flores's injuries."

7. "To a reasonable degree of medical certainty, contraction/shrinkage, degradation, deformation, chronic body reaction, chronic inflammation and chronic subclinical infection of the Uphold, Pinnacle and Solyx sling meshes caused Ms. Flores' pelvic pain after her initial implant. Scar formation is the foreseeable pathological response to mesh placement that shrinks and contracts."

8.   Ms. Flores is at risk of future erosion and contraction/shrinkage of the mesh, chronic foreign body reaction, and chronic inflammation that has not been explanted which will cause more complications and may require further surgeries.

9.   Dr. Coley, the plaintiff's surgeon who implanted the BSC devices, "did not deviate from the standard of care in her work up and evaluation of Ms. Flores. ... While Dr. Coley did cut the Pinnacle mesh during the implant procedure, it is an accepted surgical practice to cut mesh in order to accommodate the patient's individual anatomy. ... [T]he excision procedures performed by Dr. Coley met the standard of care and were medically and surgically indicated and performed in reasonable fashion. Finally the care and treatment of Dr. Koski [who did a further excision procedure] met the standard of care, were medically and surgically indicated and were performed in a reasonable fashion.

In its motion, Boston Scientific takes issue with Dr. Rosenzweig's specific causation opinions as a whole; his opinions on the properties of polypropylene; his opinions on design of the devices; and any opinions he might have on testing of medical devices and training physicians on how to use them. It also seeks to preclude opinions concerning the Chevron Phillips Material Safety Data Sheet for Marlex Polypropylene; BSC's motives and state of mind; legal conclusions; and anything else that might be "irrelevant and unhelpful."

I agree with BSC that Dr. Rosenzweig should not be permitted to testify as to how a medical device manufacturer ought to test its products or train physicians who may use them, and that no witness should be permitted to opine concerning a party's knowledge, belief, intent, state of mind, or motive unless the witness was a participant in the party's actions, which Dr. Rosenzweig was not. I also agree that the Chevron Phillips MSDS, which will be admitted on the subject of notice only, should not be part of Dr. Rosenzweig's testimony.

The causation issue, on the other hand, is fair game. Although Dr. Rosenzweig is not a chemist or a biomedical engineer, he has studied these disciplines as they relate to the degradation of polypropylene in the human body as part of his own line of work. The knowledge he has gathered

-3-

and the opinions he has developed as a result have informed his own surgical practice. He has removed polypropylene mesh products from hundreds of women in whom it was implanted, and viewed first-hand the condition of the explanted material.

Whether Dr. Rosenzweig's opinions on the implantation of polypropylene in the human body are in the minority, as BSC contends, is not the issue. He has sufficient education and experience with the product to qualify him to testify concerning the properties of polypropylene in the human body, as well as design issues relating to its use, the choices of weight and pore size, and the availability of a superior alternative.[4]

**B.      Jimmy Mays, Ph.D.**

Dr. Mays received his doctorate in Polymer Science in 1984. He worked in industry for four years, then joined the chemistry faculty of the University of Alabama at Birmingham. He rose to the title of full Professor in 1995. A major focus of his research was polymeric biomaterials, including polypropylene. He is presently an Adjunct Professor at Alabama, a Distinguished Professor of Chemistry in the University of Tennessee, and a Distinguished Scientist at the Oak Ridge National Laboratory. He has published nearly 400 peer-reviewed papers in scientific journals, half of which involve the use of gel permeation chromatography (GPC) to characterize polymer average molecular weights and molecular weight distributions, as well as other methods (spectroscopy, microscopy, and mechanical properties measurements). He has co-edited an oft-sited book titled Modern Methods of Polymer Characterization (John Wiley and Sons 1991), and is under contract to edit the second

---

[4] I note that Dr. Rosenzweig and other urogynecologists have been qualified on these subjects in other courts. See Wilkerson v. Boston Scientific Corp., 2015 WL 2087048 (S.D.W.Va., May 5, 2015) at *5-*6; Tyree v. Boston Scientific Corp., 54 F. Supp. 3d 501, 551-53 (S.D.W.Va. 2014); In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig., 711 F. Supp. 2d 1348, 1370-71 (M.D. Ga. 2010).

edition. His qualifications in the field of polymer science are impeccable, and BSC does not argue otherwise.

BSC does, however, take issue with Dr. Mays's opinions on the effect of implanted polymer on the human body. I agree that while Dr. Mays is eminently qualified to educate the jury on the subject of polymer science as applied to polypropylene, and while this may significantly advance the plaintiff's case, he will need to leave the medicine to the medics.

I would not exclude opinion testimony on the subject of *in vivo* degradation of polypropylene as explained in the section with this title at pp. 9-10 of his report, or portions of what follows in the sections titled "Effect of Polypropylene Degradation *in vivo*" and "The Choice of Polypropylene as a Material for a Permanent Implant" (pp. 10-19). These are matters of applied chemistry and, for the most part, they are explained that way and are supported with citations to peer-reviewed studies.

I would stop short, however, of opinions directly addressed to such matters as the unsuitability of polypropylene for medical devices, opinions of others concerning the same, or causation of adverse complications experienced by patients. (p. 18, first paragraph ff.). This is not Dr. Mays's field, as he has admitted in deposition testimony.

Some of Dr. Mays's report is supported with scientific literature of others. The bulk, however, concerns a study that he did with Dr. Samuel Gido, testing for degradation of material from Pinnacle and Obtryx devices (BSC products for treatment of POP and SUI, respectively) that had been implanted in patients and later explanted. Using an impressive variety of tools (Fourier transform infrared spectroscopy (FTIR), GPC, scanning electron microscopy (SEM), energy-dispersive X-ray spectroscopy (EDS), and transmission electron microscopy (TEM)), they examined eleven explanted samples (two Obtrex and nine Pinnacles) with a range of implanted

periods (four < 2 years; three 2-4 years; and four > 4 years), as well as control samples taken from two Pinnacle and one Obtryx device that had not been implanted. The authors' conclusion was that although the three controls showed no cracking and only trace oxidation in one control and none in the other two,[5] all but one of the eleven samples showed oxidation (the eleventh was accidentally omitted from this test); eight out of the eleven had discernible cracking; and there was an association between degree of cracking and length of implantation.

The experiment and its results were published in a respected peer-reviewed publication.[6] Before publication, however, the study was roundly criticized in the MDL session, which had been offered as part of Dr. Mays's testimony. Judge Goodwin took issue with the facts that

- The 11 experimental samples had been supplied by a plaintiffs' attorney; the number was small; and there was no explanation of the selection process other than these were what was available;

- There was no information concerning how the samples had been explanted, preserved, and handled before reaching the lab;

- The testers did not calculate the statistical significance of their samples or calculate the rate of error;

---

[5] "Oxidation degradation of the polypropylene results on a decrease in polypropylene molecular weight, which is known to reduce the strength of the fibers and can eventually lead to fiber failure. The degradation of the fibers due to oxidation and reduction in molecular weight eventually results in the appearance of horizontal cracking on the fiber surfaces, which becomes more severe at longer implantation times. This overall picture of oxidative degradation of implanted PP fibers is consistent with previous studies on explanted PP fibers using the same and similar analytical techniques ...." Report, pp. 20-21.

[6] A. Imel, et al., "*In vivo* oxidative degradation of polypropylene pelvic mesh," Biomaterials vol. 73, pp. 131-41 (2015).

- Bleaching of the samples to remove biological material was done inconsistently; and

- There were failures to establish and adhere to a consistent testing protocol; for example, there was no written protocol for the SEM testing, and the cracking standard was strictly visual, subjective, and new to Dr. Gido, who was responsible for spotting and counting the cracks.

The judge concluded:

> Although Drs. Mays and Gido performed tests that are supported by the literature, the haphazard application of these tests, errors, and changes to their report lead to the conclusion that their methodology is unreliable. Vigorous adherence to protocols and controls are the hallmarks of "good science."

Sanchez v. Boston Scientific Corp., WL 4851989 (S.D.W.Va. September 29, 2014) at *25-*28, citing Black v. Rhone–Poulenc, Inc., 19 F. Supp. 2d 592, 603 (S.D.W.Va.1998).

As interesting and on-point as the study is, and although I am not greatly troubled by the fact that a plaintiffs' counsel provided the samples or that the testing was done in anticipation of litigation, I have to agree with the rest of the judge's criticisms, all of which go to reliability. The study and its results will therefore be excluded. For the same reasons as with Dr. Rozensweig, Dr. Mays is also to stay away from the the Chevron Phillips MSDS and opinions regarding BSC's state of mind and corporate ethics.

## ORDER

For the foregoing reasons,

A.   BSC's Motion to Exclude the Opinions and Testimony of Bruce Rosenzweig, M.D. is ALLOWED IN PART, in that the witness is precluded from testifying as to how a medical device manufacturer should test its products; how it should train physicians

-7-

who may use them; or BSC's knowledge, belief, intent, state of mind, or motive; or the Chevron Phillips MSDS.  The motion is otherwise DENIED.

2.  BSC's Motion to Exclude the Opinions and Testimony of Jimmy Mays, Ph.D. is ALLOWED IN PART, in that the witness is precluded from offering opinions on the effect of implanted polymer on the human body, or directly addressed to such matters as the unsuitability of polypropylene for medical devices, opinions of others concerning the same, and causation of adverse complications experienced by patients; the testing and results of the eleven explanted mesh samples; the Chevron Phillips MSDS; and opinions regarding BSC's state of mind and corporate ethics. The motion is otherwise DENIED.

/s/

Thomas P. Billings
Justice of the Superior Court

Dated:  October 5, 2017

-8-